FILED
04-23-2021
CIRCUIT COURT
DANE COUNTY, WI
2021CV000968
Honorable Nia Trammell
Branch 6

**STATE OF WISCONSIN**   **CIRCUIT COURT**   **DANE COUNTY**

Priscilla Jones, Individually and on behalf of
Her Minor Child, George Brockman
925 Davis St.
Sun Prairie, WI 53590; and                    DOCKET NO. _____

Dazarrea Ervins and David Ervins, Jr., each
Individually and on behalf of their Minor
Child, Zavion Ervins                           Code: 30107
1102 Vandenburg St.
Sun Prairie WI 53590;

    Plaintiffs

    v.

Sun Prairie Area School District
501 South Bird St.
Sun Prairie, WI 53590

    Defendant

---

### COMPLAINT

---

NOW COME Plaintiffs, Priscilla Jones, on behalf of her minor child George Brockman and Dazarrea Ervins and David Ervins, Jr., on behalf of their minor child Zayvion Ervins; who file this First Amended Complaint as follows:

Case 2021CV000968      Document 2      Filed 04-23-2021      Page 4 of 31

**PARTIES**

1. Priscilla Jones is a citizen of the State of Wisconsin and lives at 925 Davis St., Sun Prairie, WI 53590.

2. Plaintiff Dazarrea Ervins is a citizen of the State of Wisconsin and lives at 1102 Vandenburg St., Sun Prairie WI 53590.

3. David Ervins, Jr. is a citizen of the State of Wisconsin and lives at 1102 Vandenburg St., Sun Prairie WI 53590.

4. George Brockman is a minor, and is citizen of the State of Wisconsin and lives at 925 Davis St., Sun Prairie, WI 53590.

5. Zayvion Ervins is a minor, and is a citizen of the State of Wisconsin and lives at 1102 Vandenburg St., Sun Prairie WI 53590

6. Defendant, SUN PRAIRIE AREA SCHOOL DISTRICT (hereinafter "SPASD"), is a public education school district and governmental entity created under Wisconsin Stat. §118, *et seq.* At all times relevant to this Complaint, SPASD was engaged in the management and government of said school district and was responsible for the actions of its' employees and for implementing official policy for the district and for protecting its students and supervising its staff.

**JURISDICTION**

7. Jurisdiction of this court is proper pursuant to Wis. Stat. 801.50 (2)(a) as the claims asserted herein arose in Dane County.

## CIVIL RIGHTS CLAIM

8.  This is, among other claims, a Civil Rights claim brought under 42 U.S.C. 2000d, et seq. and 42 U.S.C. § 1983, seeking damages, fees, costs and attorney's fees against the Defendants.

## FACTUAL ALLEGATONS

### The Incident of February 1, 2021

9.  George Brockman is an African American child, who at all times herein, was attending a Sun Prairie School District School.

10. Zayvion Ervins is an African American child, who at all times herein, was attending a Sun Prairie School District School.

11. In the fall of 2020, George Brockman and Zayvion Ervins were enrolled in sixth grade at Patrick Marsh Middle School ("PMMS"), a school under the direction of SPASD.

12. On information and belief, three teachers at PMMS collaborated on a social studies lesson relating to Ancient Mesopotamia. The general topic of Ancient Mesopotamia is contained in the textbook used in the classroom. However, the teachers collaborated to create their own lesson to be used with the students to supplement the District-curriculum.

13. On information and belief, the lesson was designed "to cover the politics of ancient Mesopotamia" This assignment asked students to apply an ancient law called Hammurabi's Code to different scenarios.

14. None of the three teachers could recall exactly how this lesson was developed but it appeared to be identical to a lesson that was available on a website known as Teachers Pay Teachers.

15. On information and belief, this lesson was not given to any student in the two to three years since its development.

16. On February 1, 2021, the first day of Black History Month, George Brockman and CB were excited to learn black history in a school dominated by white students.

17. On February 1, 2021, a date that the teachers knew or should have known had significance to their African American students, the lesson was given out to sixth grade social studies students at Patrick Marsh Middle School (hereinafter "PMMS").

18. Rather than solely presenting the Code of Hammurabi in a narrative form in its historical context, the PMMS teachers assigned interactive scenarios in which sixth grade students were to place themselves in the role of a Babylonian citizen in judgment of the actions of a slave.

19. In other words, the sixth grade students of PMMS were instructed to see themselves as citizens of a society ruled by a code based on a theological belief that the value of men is not equal.

20. The assignment included highly offensive questions.

21. One of those questions included the following scenario: "A slave stands before you. This slave has disrespected his master by telling him 'You are

not my master!' How will you punish this slave?" The assignment included
other offensive questions.

22. Sixth graders George Brockman and Zayvion Ervins were two of the students
at Patrick Marsh Middle School who were given this assignment.

23. Confused, distressed and shaken with the assignment, they brought the
assignment to the attention of their parents.

24. Zayvion Ervins later stated "It made me think of how they would treat me if
I was in-person, in class. What would they think of me, and would they treat
me like I was an outsider and make me feel scared and unsafe?"

## Background on Hammurabi and the Code

25. Hammurabi (reigned from 1792-1750 B.C.) was the sixth ruler of the First
Dynasty of Babylon. During his long reign, he oversaw the great expansion
of his empire, conquering the city-states of Elam, Larsa, Eshnunna and Mari,
an act which he regarded was part of a sacred mission to spread civilization
to all nations. Hammurabi was worshipped as a god by his subjects and was
highly revered throughout his kingdom.

26. Hammurabi was called on by the Anu the Sublime (Babylonian Creator
God), ruler of the Annunaki (7 judges of the underworld), and Bel a/d/a
Marduk (chief deity of Babylon), the son of Ea (god of water and wisdom),
to bring about a rule of righteousness to Babylon. This righteous law was the
Hammurabi Code. (https://avalon.law.yale.edu/ancient/hamframe.asp)

27. This Code of Hammurabi was carved on a steel, or stone monument.

28. On the monument, near the top, is a carving of Hammurabi receiving authority to administer the law from the god Shamash.

29. The prologue to the code establishes Hammurabi's god-ordained calling to establish law, stating "Anu and Bel called by name me, Hammurabi, the exalted prince, who feared God, to bring about the rule of righteousness in the land, to destroy the wicked and the evil-doers; so that the strong should not harm the weak; so that I should rule over the black-headed people like Shamash, and enlighten the land, to further the well-being of mankind."

30. The Code also claims that Hammurabi was sent by another Babylonian god to "to rule over men, to give the protection of right to the land."

31. The epilogue to the Code underscores its theological justification "A righteous law, and pious statute did he [Hammurabi] teach the land." ... "The great gods have called me, I am the salvation-bearing shepherd, whose staff is straight, the good shadow that is spread over my city; on my breast I cherish the inhabitants of the land of Sumer and Akkad; in my shelter I have let them repose in peace; in my deep wisdom have I enclosed them. That the strong might not injure the weak, in order to protect the widows and orphans, I have in Babylon the city where Anu and Bel raise high their head, in E-Sagil, the Temple, whose foundations stand firm as heaven and earth, in order to declare justice in the land, to settle all disputes, and heal all injuries, set up these my precious words, written upon my memorial stone, before the image of me, as king of righteousness."

32. Simply put, Hammurabi was king because the gods had chosen him. Because he was "chosen by the gods," people feared him and therefore followed his rules and laws.

33. Hammurabi's code was also considered the basis for religious legal systems. It is considered the basis for Jewish, Christian, and Islamic religious systems.

## The Fallout

34. On information and belief, a parent of one of the students of these three teachers reached out directly to one of the teachers asking to have the assignment removed due to its inappropriate and sensitive nature that was resulting in harm to her child. The teacher initially refused the request.

35. The PMMS Principal was contacted by the same parent shortly after the parent contacted the teacher, and the Principal immediately went to the teachers' classrooms and directed that the assignment be removed. It was then removed and no students were required to complete the assignment.

36. Later that day, February 1, 2021, Principal Rebecca Zahn and Associate Principal Amy Schernecker wrote to families of PMMS students the following:

> Today an assignment was given in some of our 6th grade Social Studies classes that was exploring the politics of ancient Mesopotamia. A portion of the assignment asked students to answer scenarios around Hammurabi's Code. Hammurabi's Code was a set of 282 laws established by King Hammurabi as a way to unify Mesopotamian city-states. The purpose of the activity was to help students understand how order was kept in the early civilization, how the laws that were developed, and how unjust they were. One of the scenarios posed was directly related to the treatment of slaves in

Mesopotamia; this was upsetting to students and parents. Above all, this assignment hurt our African American community.

We regret that this assignment was not racially conscious and did not align to our district's mission and vision of equity. We know that it caused harm to our students and their families. Our intent missed the mark, and for that we are deeply sorry. Going forward we will be sure to think critically about whether our intent matches our impact.

Please know that we will be following up with our students to process this event and the staff involved will apologize directly to them. We will also have student services personnel available to any of our students who need additional support.

37. SPASD also responded to the incident saying that they would continue to investigate the incident and had placed the teachers involved on administrative leave. They went on to say that the teachers who were involved in this lesson apologized to the students and families.

38. Further, the district added that their social studies curriculum review committee would meet for an "intensive review" of their teaching practices in social studies around *"the lens of racial trauma and curriculum violence."*

39. In their statement to parents, SPASD Superintendent Brad Saron, and Assistant Superintendent for Operations Janet Rosseter, stated:

We are writing today to apologize for a grave error in judgment that occurred during sixth-grade social studies instruction at Patrick Marsh Middle School. A small group of our teachers developed and used an activity that was neither racially conscious nor aligned to our district mission, vision, values, curriculum, or district equity statement.

Once we learned of this activity, we immediately stopped any further teaching of the lesson and promptly began an investigation. In

our preliminary findings, we have determined the lesson was not a part of our district curriculum and therefore, no student should participate in or complete the assignment. To be clear, this lesson is not consistent with the School Board's vision for this school district, our commitment to equity and cultural responsiveness, or the development opportunities we have invested in our staff.

The staff issued a direct apology to the students in the class and their families. While our administrative staff continues to investigate the situation, the teachers involved have been placed on administrative leave, consistent with our district's procedures.

This incident is a fracture in our system to support Every Child, Every Day. We deeply regret that this lesson took place, and we also recognize that this was a breakdown in our curricular processes and our district-wide focus on equity. In addition to immediately addressing this situation, it is important that we commit to changing our curriculum and professional development for all staff. To that end, we will work to immediately reconvene our social studies curriculum review committee for an intensive review of our social studies teaching practices with the lens of racial trauma and curriculum violence.

Our Student Services team will be following up with the students from these classrooms and will be available to support other students in processing their feelings about this incident. Further information will come from Patrick Marsh's leadership, including opportunities for listening sessions. Additionally, our Patrick Marsh leadership team will be working with Black community leaders to work toward community healing. All of our schools are prepared to support students' processing.

40. The swift and full-throated apology of PMMS and/or SPASD are clear indications of just how egregious this "error" is, and the extent of damage they admittedly anticipated this error to cause.

41. These apologies, full-throated or not, are an ineffective after-the-fact attempt to correct a terrible wrong.

42. SPASD admitted "This incident is a fracture in our system to support Every Child, Every Day. We deeply regret that this lesson took place, and we also recognize that this was a breakdown in our curricular processes and our district-wide focus on equity."

43. SPASD later retained Lori M. Lubinsky to conduct an independent employment investigation into allegations that were raised by the February 1, 2021 incident.

44. In her Investigation Synopsis dated April 9, 2021, Ms. Lubinsky found that all three teachers collaborated with regard to the slide deck that included the offensive questions.

45. By all accounts the questions were inappropriate and inconsistent with the District's vision and mission.

46. According to Ms. Lubinsky's Synopsis, this teacher-created activity was not part of the District's curriculum at any level, nor was it approved or endorsed by any level of leadership (building or District level). Again, while it appears clear that the activity was generated from a for-profit company, none of the three teachers could conclusively remember how they obtained the slides that were used in the slide deck.

47. Furthermore, Ms. Lubinsky concluded that the activity presented by the three teachers failed to comply with the District's policy, procedure, process and protocols. More specifically, these teachers' actions violated Board Policy IIAC entitled "Selection of Classroom Instructional Materials and

Resources" and Procedure IIAC-R(1) entitled "Procedures for the Selection of Classroom Instructional Materials/Resources."

48. Likewise, the activity is inconsistent with the District's approved Curriculum. It is inconsistent with the District's Equity Framework. It is also inconsistent with the many training opportunities that District staff have been afforded that address racial equity.

49. Ms. Lubinsky further concluded that the teachers' actions, while not intentional, were isolated to their classrooms but were egregious in terms of the impact on students and the community.

50. The impact of their failure to comply with the District's policies and procedures had a significant impact on the District as a whole including, but not limited to, the students who received the assignment, their parents, the entire PMMS staff and students, and the entire community.

51. In the aftermath of the incident, the three (3) teachers involved were permitted to resign through voluntary separation agreements wherein the teachers remain on paid leave for the remainder of this school year and will not be working for the district in the future.

52. This obviated the need for the District to proceed with any further action against the teachers of a disciplinary nature up to and including termination and/or non-renewal.

## Student George Brockman

53. In addition to the impact on all of the children exposed to the assignment on February 1, 2021, it was especially damaging to student George Brockman ("George") considering his history and experiences as a student with disabilities at SPASD

54. On July 3, 2014, George was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD).

55. According to the Child Mind Institute, "children with [ADHD] find it unusually difficult to concentrate on tasks, to pay attention, to sit still, and to control impulsive behavior."

56. ADHD is covered under both the Rehabilitation Act of 1973, section 504, and the Americans with Disabilities Act (ADA).

57. George entered kindergarten C.H. Bird in the fall of 2014.

58. George had a 504 plan in school for the ADHD symptoms.

59. George had an IEP and was receiving occupational therapy through the SPASD.

60. On or around May 9, 2016, George was diagnosed with dyslexia and dysgraphia.

61. Dyslexia and Dysgraphia are learning disabilities protected under the ADA.

62. Beginning when George was in first grade at C.H. Bird Elementary, Plaintiff Priscilla Jones changed her work hours so she could spend 1-2 days per week

at school for the purpose of assisting her child considering her child's disabilities.

63. Teachers and staff at C.H. Bird Elementary were aware of George's learning and behavioral challenges through Priscilla Jones directly, and because they were active participants in the 504 Plan.

64. Early on at C.H. Bird Elementary, classmates and/or other children began taunting George using racially derogatory terms.

65. Students taunted George for having "skin as black as mud."

66. On information and belief, this taunting was rarely acknowledged or corrected by teachers and staff at C.H. Bird Elementary. Instead, George would be punished for acting out.

67. George was particularly targeted by one other student who used harsh racial epithets directed toward George.

68. George's acting out mainly involved pushing the children doing the taunting.

69. Rather than protecting George from the racial harassment of fellow students, the teachers and staff at C.H. Bird Elementary called George out for pushing kids.

70. On information and belief, George was ultimately labeled a bully by teachers and staff at C.H. Bird Elementary, despite their knowledge of his learning and behavioral challenges.

71. When Plaintiff Priscilla Jones complained of this abuse, Principal Kayla Gauwitz dismissed and/or defended the other student's behavior telling Ms.

Jones that "people paid a lot of money to send their kids to this school," insinuating that George was not as deserving.

72. George was in first grade when Plaintiff Priscilla Jones went to his school to assist her child and discovered that George had been locked in a classroom alone and unsupervised and unable to get out, because George was "behind on a project."

73. While in second grade at C.H. Bird Elementary, the teacher put George together with the tormentor in a misguided effort to teach the children to get along. This was severely agitating to George and proved to be a socially and emotionally catastrophic strategy by a trained professional.

74. George began second grade at C.H. Bird Elementary, but finished it at Northside, another Sun Prairie School District school.

75. When George was in second grade at Northside, Plaintiff Jones. Jones arrived to find her child on the ground laying face down as a punishment.

76. At all times herein, Plaintiff Priscilla Jones made her complaints known to the teachers and principal of the SPASD schools where her child was enrolled.

77. George continued in Sun Prairie School District schools, and in the fall of 2020, was enrolled at Patrick Marsh Middle School for sixth grade.

## CAUSES OF ACTION:

### COUNT I

### VIOLATION OF WISCONSIN STATUTE § 118.13

78. Plaintiffs reallege and incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

79. Under Wis. Stat. § 118.13, pupil discrimination is prohibited. "No person may be denied admission to any public school or be denied participation in, be denied the benefits of or be discriminated against in any curricular, extracurricular, pupil services, recreational or other program or activity because of the person's sex, race, religion, national origin, ancestry, creed, pregnancy, marital or parental status, sexual orientation or physical, mental, emotional or learning disability.

80. Wis. Stata. §118.13(2) states: "Each school board shall develop written policies and procedures to implement this section and submit them to the state superintendent as a part of its 1986 annual report under s. 120.18. The policies and procedures shall provide for receiving and investigating complaints by residents of the school district regarding possible violations of this section, for making determinations as to whether this section has been violated and for ensuring compliance with this section."

81. Section PI 9.03, Wis. Admin. Code illustrates the scope and breadth of the required district policies by identifying many of the areas subject to the

nondiscrimination policy. They include admission to classes or programs, rules of conduct and discipline, selection of instructional and library media materials, and facilities, among others. However, the pupil nondiscrimination statute applies to all aspects of district operations and programs. Therefore, the listing in PI 9.03 should be regarded as illustrative and not exhaustive. What the law requires is that the pupil nondiscrimination policy or policies that the district adopts apply to all areas.

82. SPSD was negligent in failing to implement, adopt or maintain policies that ensured the pupils in its control and care would be protected from racial discrimination from its own employees.

83. As a result, Plaintiffs suffered damages in terms of severe emotional distress.

## COUNT II

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS: THE FEBRUARY 1, 2021 INCIDENT

84. Plaintiffs reallege and incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

85. Plaintiffs are alleging intentional infliction of emotional distress under Wisconsin law. *Alsteen v. Gehl,* 21 Wis.2d 349, 124 N.W.2d 312 (1963), in that the above-described actions were intentional, extreme and outrageous, and caused severe emotional distress.

86. To state a cause of action for intentional infliction of emotional distress, a plaintiff must allege: (1) the defendant's conduct was intentional, that is, the

defendant behaved as she did for the purpose of causing emotional distress; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the injury; and (4) the plaintiff suffered an extreme and disabling emotional response to the conduct.1 *Alsteen v. Gehl*, 21 Wis.2d 349, 124 N.W.2d 312 (1963).

87. The assignment of February 1, 2021, the first day of Black History Month, was formulated by SPASD teachers, staff and/or agents, presumably trained in the "fostering and supporting the social and emotional growth of all students."

88. On information and belief, the teachers had withheld the assignment until February 1, the first day of Black History Month.

89. The emotional and psychological effect of such an assignment is obvious, and the assigning teachers, under the guidance of SPASD, knew or should have known that its effect would be disastrous for the sixth grade African American students.

90. When a parent initially complained, the teacher(s) refused to withdraw the assignment.

91. All three teachers acknowledged that, *upon reflection*, the questions were inappropriate and never should have been given.

92. They also acknowledged the significant impact these questions have had both on students and the community as a whole. Simply stated, they just did not

appreciate, understand or evaluate how the questions could be interpreted by others.

93. Likewise, this lesson was clearly inconsistent with the District's approved Curriculum. It is inconsistent with the District's Equity Framework. It is also inconsistent with the many training opportunities that District staff have been afforded that address racial equity.

94. Ms. Lubinsky concluded that the teachers' actions "were egregious in terms of the impact on students and the community."

95. The impact of these failures on the part of SPASD to comply with the District's own policies and procedures had a significant impact on the District as a whole including, but not limited to, the students who received the assignment, their parents, the entire PMMS staff and students, and the entire community.

96. In the aftermath of the incident, the 3 teachers involved were permitted to resign through voluntary separation agreements wherein the teachers remain on paid leave for the remainder of this school year and will not be working for the district in the future. This obviated the need for the District to proceed with any further action against the teachers of a disciplinary nature up to and including termination and/or non-renewal. The District is working to address the impact of these teachers' actions on the District students, staff and community.

97. Plaintiffs have been damaged by a system unable or unwilling to fulfill its duty to protect George and Zayvion Ervins, from exactly this type of racial abuse.

98. Furthermore, they are suspicious that the "thoughtless error" -- yet another in a line of so many of these type incidents in these uncertain times – is the product of a more calculated and intentional attempt to create harm. That the teacher(s) knew or should have known that this would create harm is a certainty. That they were not fired on the spot casts an ugly glare on the intentions of PMMS, SPASD and their entire staff.

99. The trained teachers and staff of PMMS knew or should have known what goes into fostering and supporting the social and emotional growth of all students. PMMS, and SPASD are liable for the actions of these teachers, who were clearly acting under color of state law.

100. SPASD, through its schools, teachers and/or other agents, caused emotional distress for George Brockman, Zayvion Ervins and other PMMS students in the following ways:

   a. Failing to oversee its agents, teachers and employees;
   b. Assigning students an inflammatory lesson, by education professionals trained in the fostering the emotional and social growth of their students, which lesson would have the obvious and calculated outcome of causing harm.
   c. Performing actions "were egregious in terms of the impact on students and the community."

## COUNT III

## VIOLATION OF CIVIL RIGHTS, TITLE VI, 42 U.S.C. § 2000d ET SEQ.

101. Plaintiffs reallege and incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

102. SPASD violated the Civil Rights Act of 1964 (Title VI), 42 U.S.C.2000d, et seq., which prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving Federal financial assistance.

103. As publicly funded entities, SPASD had a duty to uphold Title IV of the Civil Rights Act of 1964.

104. Instead, on the first day of Black History Month, a fact that should not be lost on an educator, they asked a classroom of mostly white students, and a small minority of African Americans, including Zayvion Ervins, how they would reprimand a slave for disrespecting his/her master.

105. A violation of Title VI may be found if racial harassment is severe, pervasive, or persistent so as to constitute a hostile or abusive educational environment.

106. Plaintiffs are alleging that the incident described above is racial harassment that is severe and therefore a violation of Title VI.

## COUNT IV

## VIOLATION OF 42 US CODE § 1983 AND
## TO THE 14th AMENDMENT TO THE U.S. CONSTITUTION

107. Plaintiffs reallege and incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

108. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

109. As demonstrated above, the acts and omissions of SPASD specifically undermined and interfered with the rights and benefits of education owed to George Brockman and Zayvion Ervins under 42 U.S.C. §1983.

110. As a result of this deprivation of rights, sixth grade students endured emotional anguish and humiliation from the loss of liberty.

111. Furthermore, lesson learned from the February 1, 2021 assignment – that slavery is acceptable – is one that will undermine their security, confidence and sense of well-being for an indeterminable amount of time.

## COUNT V

**VIOLATION OF THE FIRST AMENDMENT ESTABLISHMENT CLAUSE**

112. Plaintiffs reallege and incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

113. The test of whether or not a government practice violates the Establishment Clause is "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive entanglement with religion." *Lemon v. Kurtzman,* 403 U.S. 602 (1971).

114. The source and authority of the Code of Hammurabi is theological in nature, ordered and ordained by gods, and is often compared to and/or thought by scholars to be the precursor to the Ten Commandments.

115. As such, teaching the Code of Hammurabi in an interactive manner is akin to having students act out scenes from the Old Testament of the bible regarding Moses' receiving of the Ten commandments, or a scene from the new testament in which Pontius Pilate washes his hands. This represents an excessive entanglement of church and state and so violates the First Amendment's Establishment Clause.

116. Furthermore, while the Code of Hammurabi has historical significance for the fact that it codified laws and punishments ("eye for an eye") that applied to all citizens of Babylon, it also establishes a hierarchy of punishments

according to the class of the perpetrator and/or victim. , that is based on and supported by theology.

117. The manner in which this information was presented, in having students imagine they were citizens of Babylon, an ancient culture entrenched in the theology, sitting in judgment of slaves, has no secular legislative purpose, and therefore is unconstitutional as violating the Establishment Clause of the First Amendment.

## <u>COUNT VI</u>

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS: George Brockman**

118. Plaintiffs reallege and incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

119. Plaintiffs are alleging intentional infliction of emotional distress under Wisconsin law. *Alsteen v. Gehl,* 21 Wis.2d 349, 124 N.W.2d 312 (1963), in that the above-described actions were intentional, extreme and outrageous; caused severe emotional distress.

120. To state a cause of action for intentional infliction of emotional distress, a plaintiff must allege: (1) the defendant's conduct was intentional, that is, the defendant behaved as she did for the purpose of causing emotional distress; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the injury; and (4) the plaintiff suffered an extreme and disabling emotional response to the conduct.1 *Alsteen v. Gehl*, 21 Wis.2d 349, 124 N.W.2d 312 (1963).

121. When George was in the first grade, SPASD teachers and/or staff, knowing of and presumably trained to handle children with learning disabilities, nonetheless locked the then six year old George in a classroom, alone, unsupervised, and unable to get out.

122. This was an intentional and thoughtful act by trained teachers and staff, which outcome the teachers and/or staff knew or should have known was detrimental to George's health and well being.

123. When George was in the second grade, SPASD teachers and/or staff, knowing of and presumably trained to handle children with learning disabilities, nonetheless intentionally put George together with the very student who was racially and emotionally harassing and abusing him.

124. This was an intentional and thoughtful act by trained teachers and staff, which outcome the teachers and/or staff knew or should have known was detrimental to George's health and well-being.

125. When George was in the second grade, SPASD teachers and/or staff, knowing of and presumably trained to handle children with learning disabilities, nonetheless intentionally punished him by having him lay face down on the ground.

126. This was an intentional and thoughtful act by trained teachers and staff, which outcome the teachers and/or staff knew or should have known was detrimental to George's health and well being.

127. SPASD, through its schools, teachers and/or other agents, caused emotional distress for George in the following ways:

    a. Failing to de-escalate situations that would exacerbate the child's disability;

    b. Allowing other students to taunt George, and/or failing to stop or curb their taunts;

    c. Failing to recognize the effect of such racial and other taunts to a child with George's disabilities;

    d. Punishing George for acting out against the tormentors, which behavior was a symptom of his disability.

    e. Denying George his rights under the ADA.

## COUNT III

### VIOLATION OF SECTION 504

### OF THE REHABILITATION ACT OF 1973

### Title II of the Americans with Disabilities Act ("ADA")

128. Plaintiffs reallege and incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

129. The Sun Prairie School District is a "local educational agency" as defined by the ADA. 20 U.S.C. § 7801(30).

130. The ADA and accompanying Regulations expressly prohibit title II entities from escaping liability through contract. The ADA Regulations explicitly state that, "[a] public entity, in providing any . . . service, may not, directly or through contractual . . . arrangements, [discriminate] on the basis of disability . . . ." 28 C.F.R. § 35.130(b)(1).

131. SPASD, through its schools, teachers, contractors and/or other agents, were active participants in George's 504 Plan under Title II of the ADA.

132. SPASD, through its schools, teachers and/or other agents, discriminated against George by denying the child accommodations under the 504 Plan under Title II of the ADA in the following ways:

    a. Failing to de-escalate situations that would exacerbate the child's disability;
    b. Allowing other students to taunt George, and/or failing to stop or curb their taunts;
    c. Failing to recognize the effect of such racial and other taunts to a child with George's disabilities;
    d. Punishing George for acting out against the tormentors, which behavior was a symptom of his disability.

133. Despite the complaints of Plaintiff Priscilla Jones, SPASD was deliberately indifferent to such discrimination.

## RATIFICATION

134. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

135. The Defendant ratified the acts, omissions and customs of their respective personnel and staff.

136. As a result, the Defendants are responsible for the acts and omissions of staff persons who were otherwise responsible for protecting the students of SPASD.

## PROXIMATE CAUSE

137. Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

138. Each and every, all and singular of the foregoing acts and omissions, on the part of any or all of the Defendants, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## DAMAGES

139. As a direct and proximate result of the SPASD's conduct, George Brockman and Zayvion Ervins have suffered injuries and damages, for which they are entitled to recover herein pursuant to 42 U.S. Code § 2000c–8, within the jurisdictional limits of this court, including but not limited to:

   a. Loss of educational opportunities;
   b. Physical pain in the past;
   c. Medical expenses in the past;
   d. Mental anguish in the past;
   e. Mental anguish in the future;
   f. Physical impairment in the past; and
   g. Various out-of-pocket expenses incurred by SQ's family but for the acts and omissions of the District.

140. As a direct and proximate result of the Sun Prairie Defendant's conduct, Plaintiffs have suffered injuries and damages, for which they are entitled to recover herein within the jurisdictional limits of this court.

## ATTORNEY FEES

141. It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to their costs and any reasonable attorney's fees in this action, pursuant to 42 U.S.C. §1988(b).

## PUNITIVE DAMAGES

142. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

143. As noted above, Defendant Sun Prairie School District has a history of problems regarding discrimination based upon race and nationality.

144. The acts and omissions of the Sun Prairie Defendants shock the conscience, and thus satisfy criteria for punitive damages, as contemplated by §1983.

## RELIEF REQUESTED

WHEREFORE, Plaintiff seeks relief in excess of $75,000, and as described below:

## EQUITABLE RELIEF

Petitioners respectfully requests that the Court order SPASD to:

a. Adopt policies, procedures and practices within and among its teachers, agents and employees, forbidding outside or independent assignments without first being reviewed by SPASD;

b. Provide staff with "Diversity training" by a third party to include information about race, nationality, gender and disability stereotypes;

c. Provide staff, teachers, employees and agents with training regarding children with disabilities with respect to implementing and honoring the ADA 504 Plan;

d. Provide counseling services for students harmed by the February 1, 2021 incident;

e. Appoint a committee including interested members of the public to address the issues noted herein and report back to the School District, and act accordingly; and

f.   Adopt policies, procedures, and practices commensurate with the anti-bullying efforts;

g.   Retain a neutral third party to complete a racial harassment assessment for each campus and have that a person or entity report back to the Superintendent so that SPASD may address any issues noted in the assessment;

h.   For any other relief the Court may see fit to prescribe.


**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY.**

DATED April 23, 2021.

Respectfully Submitted,

THE LAMARR FIRM, PLLC

BY:__ /S/ *B'Ivory LaMarr* _____
Attorney B'Ivory LaMarr (WI BAR #1122469)
5100 Westheimer Rd, Suite 200
Houston, TX 77056
PHONE: 800.679.4600 ext. 700
Email: blamarr@lamarrfirm.com