IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAZARREA ERVINS, individually and on behalf of her
minor child, Zavion Ervins, and
PRISCILLA JONES, individually and on behalf of her
minor child, George Brockman,

OPINION and ORDER

                    Plaintiffs,

     v.                                       21-cv-366-jdp

SUN PRAIRIE AREA SCHOOL DISTRICT,

                    Defendant.

---

On February 1, 2021, the first day of Black History Month, three sixth-grade social studies teachers at a Sun Prairie middle school distributed electronic learning materials about ancient Mesopotamia. A quiz at the end of the materials asked students to assume the position of a judge and apply the Code of Hammurabi to several factual scenarios, one of which asked the students to decide how to punish a defiant slave. The assignment triggered a storm of outrage in the school community and among the general public. The Sun Prairie Area School District apologized, commissioned an investigation, and suspended the teachers, who ultimately resigned.

The plaintiffs in this case are Dazarrea Ervins and Priscilla Jones, the parents of two Black students who attended the middle school. Plaintiffs contend that the Mesopotamia materials, and the school district's handling of the incident, violated their rights and those of their children under federal and state law. Plaintiffs also contend that one of the students, George Brockman, who was not in a class that received the Mesopotamia materials, was subjected to racial and disability harassment by students and staff at district schools over the course of his education.

The school district moves for summary judgment. The quiz was offensive and insensitive. But for reasons explained in this opinion, it did not violate the Fourteenth Amendment, the Establishment Clause of the First Amendment, or federal anti-discrimination law. There is no basis to hold the school district liable under federal law for its handling of the incident.

George Brockman's claims also fail. George suffered years of verbal abuse at the hands of a few fellow students, which his teachers were unable to stop. But there is no evidence that this harassment was based on his disability. There is no genuine dispute that he was cruelly bullied based on his race. But George's claim is based on the denial of educational opportunity, and plaintiffs adduce no admissible evidence that his education suffered, which is a necessary element of that claim.

With the federal claims out of the case, the court will decline to exercise supplemental jurisdiction over plaintiffs' state-law claims and remand those to state court.

UNDISPUTED FACTS

The court begins with problems in the parties' summary judgment evidence. Plaintiffs respond to many of defendant's proposed facts with argument and additional facts. *See, e.g.,* Dkt. 50, response to ¶ 24. These responses contravene the court's summary judgment procedures and they fail to raise genuine factual disputes. The court has ignored the argumentative responses and it will deem the corresponding facts to be undisputed.

The school district responds to many of plaintiffs' supplemental facts with groundless hearsay objections. For example, plaintiffs propose as undisputed facts that Zavion became depressed, received hate mail, and was subjected to racial insults, all based on Zavion's

deposition testimony. Dkt. 49, ¶ 96. The school district objected that Zavion's deposition testimony is inadmissible as hearsay. The school district lodged the same objection to George's testimony that he was subjected to racial insults. *Id.*, ¶ 108. The hearsay objections are frivolous, because the racial insults are not offered for their truth. Zavion and George have first-hand knowledge that they suffered racial name-calling and this testimony is admissible. The school district also objects to certain facts because counsel had lodged a "form" objection during the cited deposition testimony. *See, e.g., id.*, ¶ 18. These objections are also frivolous; making a form objection during a deposition does not render the testimony inadmissible. The court has disregarded the school district's responses based on hearsay objections or objections to the form of deposition questions.

The school district moves to strike the declarations of plaintiffs' expert, Bruce I. Levenberg. Dkt. 36. Defendants contend that Levenberg's supplemental report, Dkt. 36-2, is untimely and that his original report, Dkt. 36-1, does not contain an adequate disclosure of the bases of his opinions. Plaintiffs counter that the delay in disclosing the supplemental report was harmless. But the supplemental report came after Levenberg's deposition, and thus the delay inhibited defendants' preparation for the deposition. Plaintiffs also contend that the supplemental report was authorized by Rule 26(e). But that ignores that scheduling order, Dkt. 12, which explains: "Supplementation under Rule 26(e) is appropriate only to correct mistakes and oversights, not to include new examples, illustrations, or analyses that could have been included in an original expert report." And in any case, a supplemental report would be due not later than five days before the expert's deposition. *Id.* The supplemental report is excluded as untimely.

The Levenberg declarations also have substantive problems. Levenberg purports to have conducted a "forensic case study analysis" of the role of the school district and its personnel. But "forensic case study analysis" is not a systematic analytical methodology and his report is highly conclusory. He does not cite any evidence that anyone "harassed, intimidated, and bullied" students into assuming the role of "Slave Master" in connection with the Mesopotamia assignment. He does not explain specifically how the school district or any of its personnel violated any established professional standards. His opinions about the long-term effects on George and Zavion are highly speculative and beyond his expertise. The court will grant the defendant's motion to exclude Levenberg's evidence under Federal Rule of Evidence 702 because it is unreliable and unhelpful to resolving the issues before the court. In the analysis section below, the court will further explain its conclusion that Levenberg's opinions are unhelpful and conclusory.

With these preliminary matters in mind, the following facts are not genuinely disputed.

## A. The Mesopotamia assignment

In February 2021, Zavion Ervins and George Brockman were sixth graders at Patrick Marsh Middle School in the Sun Prairie Area School District. (Because Dazarrea and Zavion share the same last name, the court will refer to all plaintiffs by their first names). Zavion and George are Black.

February 1 was the first day of Black History Month, so Black history was part of the curriculum at the time. Sixth graders were also beginning a unit on ancient Mesopotamia. Because of the COVID-19 pandemic, classes at Patrick Marsh were taught remotely that semester. Students were sent a slide deck with lessons and activities to read and complete at

home each day. Zavion was in Mary Headington's social studies class; George was in a different class.

The February 1 slide deck in Zavion's class included a Black History Month slide featuring Black leaders, including Barack Obama, Rosa Parks, and Martin Luther King, Jr. Dkt. 33-1. The rest of the deck was about the geography, religion, and politics of ancient Mesopotamia. The deck contained several slides about Hammurabi, a Mesopotamian king who created an early set of laws known as Hammurabi's Code.

At the end of the slide deck, there was an interactive assignment, titled "Hammurabi's Code—Your Turn to be the Judge," that asked students to apply Hammurabi's Code to three scenarios. One scenario stated:

> A slave stands before you. This slave has disrespected his master by telling him "You are not my master!" How will you punish this slave?

Dkt. 31-1, at 19. The students were supposed to type in their answers and the correct answer would be revealed. The correct answer was "put to death." Dkt. 40-4.

Zavion was upset when he saw the question. He emailed Headington and showed the slide to his mother, Dazarrea. Dazarrea also emailed Headington to complain. Headington replied to Dazarrea that Headington did not mean to offend anyone and said that Zavion did not need to complete the assignment if it made him uncomfortable.

Dazarrea called the principal at Patrick Marsh, Rebecca Zahn. When Zahn learned about the Mesopotamia materials, she directed Patrick Marsh teachers to stop using them and contacted district leadership to inform them about the situation and discuss next steps. Before Dazarrea's call, neither Zahn nor any other Patrick Marsh administrator, school district administrator, or district curriculum committee member had seen or known about the

materials. The materials were not part of the school district-approved social studies curriculum. Rather, Headington and two other teachers had adopted them to supplement the Mesopotamia curriculum.[1] The materials had also been distributed to students in 2019 and 2020.

George was not in a class that received the Mesopotamia materials. But he learned about them later that afternoon when sixth-grade Patrick Marsh students were asked to join a Zoom meeting, where staff "apologize[d] to the African Americans" for having an assignment about slavery. Dkt. 50, ¶¶ 87, 88. George became upset, left the Zoom meeting, and called his mother, Priscilla. Meanwhile, the slave question had gone viral in the news and on social media. George's brother sent George and Priscilla a screenshot of the question that he had found online. When George saw it, he ran to his room, cried, banged his head on the wall, and intentionally fell off a couch to hit his head. He "didn't know how to feel," was hurt, and "wanted to disappear." Dkt. 24 (George Dep. 114:22–23). He tried to hurt himself several times per week for about one month and saw a therapist for several months. He started to feel better after he began going to the gym in March.

The school district took a series of steps following the February 1 incident. It issued a district-wide apology to families and staff and began an initial internal investigation. Several days later, the district hired a law firm to investigate the incident. Headington and the two other teachers who had created the assignment were placed on paid administrative leave, and eventually they resigned. The school district released the results of the investigation when it was complete. It also held mandatory professional training on harmful curriculum content, reviewed the social studies curriculum, partnered with an outside organization to provide

---

[1] Who actually created the Mesopotamia materials is unclear from the record.

healing sessions, and collaborated on a district-wide equity assessment with the African American Parent Network.

The February 1 incident was the second high-profile racial incident in the school district in recent years. In November 2019, a student wore blackface makeup to a basketball game. The event garnered media attention and prompted the school district to issue a press release acknowledging and committing to address racism in the district.

## B. George's learning disability and racial bullying

George also brings claims unrelated to the Mesopotamia materials based on mistreatment by staff and students at several schools within the district. He says that teachers inappropriately isolated him from his classroom and that his classmates racially bullied him from kindergarten to seventh grade.

George attended kindergarten at C.H. Bird elementary school within the school district. That year, he received what is known as a "504 plan," to provide accommodations to a child with a disability. The plan stated that George had "difficulty with attention and behavioral inhibition," and one of the accommodations it called for was an "an alternative spot away from the class group for George to regain his self-control." Dkt. 50, ¶ 111–13. George had a similar 504 plan at C.H. Bird for first grade. Several times over those two years George was separated from his class under circumstances that plaintiffs contend were isolating and inappropriate.

George was also racially bullied in district schools beginning in kindergarten. With the exception of his first year of middle school, which was conducted remotely, George was regularly teased and insulted about his skin color. For example, almost every day of kindergarten, one student told George that "looked like mud," and "looked dirty."[2] Dkt. 24

---

[2] Defendants object on hearsay grounds to plaintiffs' proposed facts about the racial insults

(George Dep. 12:4–11). As time went on, more students participated. George was repeatedly called the n-word and sometimes poked or pushed. George and Priscilla complained, and the teachers would sometimes separate George and the offending student. But the racial harassment continued from kindergarten to middle school.

Additional relevant facts are cited in the analysis below.

## ANALYSIS

Plaintiffs abandoned some claims at summary judgment, leaving two groups of claims in the case. First, plaintiffs assert several claims based on the Mesopotamia materials. Those claims arise under: (1) Title VI of the Civil Rights Act; (2) the Fourteenth Amendment; (3) the Establishment Clause of the First Amendment; and (4) the state-law tort of intentional infliction of emotional distress. Second, plaintiffs assert claims based on George's mistreatment by staff and students at district schools. These claims arise under: (1) Title VI; (2) the Americans with Disabilities Act (ADA) and the Rehabilitation Act; and (3) the state-law tort of intentional infliction of emotional distress.

The school district moves for summary judgment. Summary judgment is appropriate if the school district shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To avoid summary judgment, plaintiffs must set forth specific facts supported by admissible evidence that create a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is

---

directed toward George. As explained above, the students' racial insults are not offered for their truth; they are not hearsay. The court deems George's testimony about the history of racial insults to be undisputed.

the "put up or shut up" moment, when the parties must show that they have sufficient admissible evidence to support their claims to warrant a trial. *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted).

## A. Claims based on the Mesopotamia materials

### 1. Standing

The school district challenges plaintiffs' standing to pursue some of their claims arising from the Mesopotamia materials. Standing is a component of the court's subject matter jurisdiction under Article III of the Constitution. *See Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). To establish standing, plaintiffs must show that they suffered an injury-in-fact that is both fairly traceable to the challenged conduct of the defendant and likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury-in-fact is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks omitted).

The school district challenges plaintiffs' standing on two grounds. First, the school district contends that the parents lack standing to bring claims on their own behalf based on the Mesopotamia materials. Second, the district contends that George and Priscilla lack standing to raise claims based on the materials because George was not in a class that received those materials.

### a. Parental standing

For each alleged violation, plaintiffs assert one claim on their own behalf and one claim on their child's behalf. The school district does not challenge the parents' standing to assert claims on behalf of Zavion and George.

The school district argues that Dazarrea and Priscilla cannot establish their own injury-in-fact because the assignment did not directly harm them. The district makes this argument on the parents' Fourteenth Amendment claims, but there is no reason why the same standing requirements would not apply to all of the parents' Mesopotamia material claims, including their Establishment Clause claim of religious interference.

The general rule is that parents have standing to assert claims on their own behalf for constitutional violations involving their children at school only if the violation directly affects the parents. *Fleischfresser v. Directors of Sch. Dist.* 200, 15 F.3d 680, 683 (7th Cir. 1994). In other words, the parents must point to some interference with their own rights to establish an injury-in-fact; they may not rely solely on interference with the rights of their children. *Id*. When, as is the case with the parents here, a plaintiff is not the direct subject of the challenged government conduct, standing is "substantially more difficult to establish." *Lujan*, 504 U.S. at 562.

Plaintiffs contend that Dazarrea and Priscilla "experienced their own individualized injuries separate and apart from their children." Dkt. 39, at 3. They allege interference with their parent-child relationships and with their abilities to direct the religious training of their children. These types of interference might qualify as injuries for purposes of standing. *Fleischfresser*, 15 F.3d at 684; *Montoya v. Jeffreys,* No. 18 C 1991, 2020 WL 6581648, at *6 (N.D. Ill. Nov. 10, 2020) (citing *Troxel v. Granville,* 530 U.S. 57, 65 (2000).

But plaintiffs cite insufficient evidence to support their alleged injuries. They adduce identical statements in Dazarrea and Priscilla's declarations that "I suffered severe emotional distress and depression resulting from the unauthorized interference with my parental child relationship." Dkt. 44, ¶ 9; Dkt. 42, ¶ 8. Dazarrea also stated in her declaration that

10

Hammurabi's Code was against her morals and undermined the religious principles and guidance she taught Zavion. Dkt. 44, ¶¶ 7−8. And Priscilla testified that the assignment interfered with George's religious training because the "eye for an eye" philosophy in Hammurabi's Code compromised the religious principles she has tried to instill in George. Dkt. 25 (Priscilla Dep. 220:15–21); Dkt. 42, ¶ 6.

These generic assertions of emotional distress might have been enough to defeat a motion to dismiss at the pleading stage. But at summary judgment, a plaintiff must articulate "specific facts" about the harms they personally and directly suffered, including what happened and when. *See Lujan,* 504 U.S. at 562–64. Vague and unspecific statements, and bald assertions of a general truth, are not enough. *Id.*; *Drake v. Minnesota Mining & Manufacturing Co*., 134 F.3d 878, 887 (7th Cir. 1998) (Rule 56 requires evidence of specific concrete facts establishing the existence of the truth of the matter asserted).

Plaintiffs' declaration statements are no more than vague and conclusory assertions. The statements are generic and not particularized to Dazarrea and Priscilla. They contain no details or explanation about how Dazarrea and Priscilla's relationships with their children were harmed. And neither plaintiff has pointed to specific facts demonstrating religious interference. *Lujan,* 504 U.S. at 562–64. Plaintiffs do not say what religion they belong to, describe their children's religious upbringing, or explain how teaching Hammurabi's Code compromised their children's religion. The parents say they disagreed with the values in Hammurabi's Code, but it's hard to imagine any citizen of the contemporary United States endorsing those values. Nothing in the Mesopotamia materials endorsed Hammurabi's Code; it was presented as part of a history lesson, not as a moral code to guide the students' lives. The court concludes that plaintiffs have not established any plausible interference with Dazarrea and Priscilla's right to

parent or direct the religious education of their children, and thus they do not have standing to pursue the parental claims based on the Mesopotamia materials.

The school district also contends that the parents lack standing to bring claims under Title VI. Title VI prohibits discrimination in federally funded programs, and it is undisputed that the school district receives federal funding. But it is well-established that a Title VI plaintiff must himself be a participant or beneficiary in the program at issue. *Shebley v. United Cont'l Holdings, Inc.*, 357 F. Supp. 3d 684, 694 (N.D. Ill. 2019) (collecting cases). Parents may not assert Title VI claims because they do not attend public schools—their children do. *Id*. This provides further grounds to dismiss the parents' Title VI claims, but it is really a matter of the merits, and not strictly speaking a matter of Article III standing.

The quiz question about the defiant slave was understandably upsetting to the plaintiff parents. But frustration and disagreement with government action does not constitute an injury for purposes of standing. *See Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 807–08 (7th Cir. 2011). The parents fail to adduce evidence that the assignment injured them in a concrete and particularized way. The parents' claims brought on their own behalf will be dismissed.

### b. George's standing to challenge the Mesopotamia materials

The district contends that George and Priscilla lack standing to bring claims arising from the Mesopotamia materials because he was not in a class that received those materials.

Whether George can demonstrate an injury-in-fact based on the assignment presents a closer question than the parents' injuries. On one hand, George did not view the slide deck during school and was not expected to answer the question about slavery. This undermines George's standing because a plaintiff ordinarily does not have standing to challenge government

12

conduct that has not been directly applied to him and therefore does not directly affect him. *See Freedom From Religion Found., Inc.*, 641 F.3d at 806.

But on the other hand, George points to some direct harms. The day the materials were distributed, he was called into Zoom meeting during which teachers "apologized to the African Americans" for the assignment's content. So even though George did not receive the assignment, the district took time out of his school day to bring it to his attention and discuss it. George also testified that the meeting upset him, making him feel "sad," "hurt," "betrayed," "mad," and like he could not "trust White people." Dkt. 24 (George Dep. 107:5–11). And when George saw a screenshot of the assignment later that day, he became so upset that he tried to hurt himself. He continued to attempt self-harm for weeks after the incident and saw a therapist for several months.

The court concludes that George has demonstrated an injury-in-fact. As for the other standing requirements, George's injury was fairly traceable to the district because it was the result of the actions of district staff, and success in this lawsuit would likely redress the harms he experienced. So Priscilla has standing to assert claims on George's behalf based on the Mesopotamia materials.

### 2. The merits of claims based on the Mesopotamia materials

Plaintiffs contend that the Mesopotamia materials and the district's handling of the incident violated Zavion and George's rights under Title VI, the Fourteenth Amendment, and the Establishment Clause. Because plaintiffs assert the same claims involving the same events, the court will analyze Zavion's and George's claims together.

a.   **Title VI claims**

Plaintiffs bring hostile learning environment claims against the district under Title VI. Title VI protects against intentional discrimination based on race in programs receiving federal financial assistance. 42 U.S.C. § 2000d; *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). Title VI claims are generally evaluated under the same framework as claims under Title IX. *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014) ("Title VI and Title IX are so similar that a decision interpreting one generally applies to the other.").

To establish a hostile educational environment claim, a plaintiff must show that: (1) the student participated in a federally funded program; (2) the alleged hostile environment was so severe, pervasive, and objectively offensive that it deprived the student of access to educational benefits; and (3) the school district had actual knowledge of and was deliberately indifferent toward the conduct in question. *N.K. v. St. Mary's Springs Acad. of Fond Du Lac Wisconsin, Inc.*, 965 F. Supp. 2d 1025, 1032 (E.D. Wis. 2013). The first element is not disputed. But defendants contend that plaintiffs cannot establish the second and third elements because the assignment did not create any severe and pervasive hostility and that the district's response to the assignment was reasonable.

Plaintiffs counter that the district created a racially hostile learning environment based on three events: (1) the distribution of the Mesopotamia materials; (2) the November 2019 incident at a school in the district in which a student wore blackface makeup at a basketball game; (3) a district press release published after the blackface incident pledging to address racism in the district. But these events, even taken together, are not sufficiently severe, pervasive, or objectively offensive to create a hostile environment.

The court will begin with the events related to the blackface incident. Those events do not support plaintiffs' claims because there is no evidence that the incident happened at Patrick Marsh, that the incident affected plaintiffs personally, or that the incident contributed to racial hostility at plaintiffs' school. And the district's press release was not hostile. It acknowledged a problem and proposed solutions for better serving students of color.

As for the Mesopotamia materials and the question about slavery, a reasonable jury certainly could find that its content and timing were offensive, insensitive, and justifiably upset students and their families. But a hostile environment claim requires much more than a single upsetting episode. The point is well-established in the employment discrimination context. *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993). In the education context, courts have required consistent and or severe misconduct, such as physical threats, the use of racial epithets, violence, or sexual contact and abuse at school to establish a hostile environment claim. *See, e.g., Doe I v. Bd. of Educ. of City of Chicago*, 364 F. Supp. 3d 849, 860 (N.D. Ill. 2019) (school employee who made sexually explicit comments to students, walked into locker room while students were changing, sexually touched students, slapped them, and committed battery against students created a hostile educational environment); *Qualls v. Cunningham*, 183 F. App'x 564, 567 (7th Cir. 2006) (threats, racial slurs, and unfounded attempts by campus police to detain plaintiff would constitute a hostile educational environment); *C.S. v. Couch*, 843 F. Supp. 2d 894, 908 (N.D. Ind. 2011) (racial epithets, threats, throwing a student into a bathroom stall, and punching him in the face constituted hostile racial environment); *Galster*, 768 F.3d at 618 (student-on-student harassment involving multiple serious violent physical attacks created a hostile learning environment). Even when a school authority figure is responsible for the offensive conduct, a hostile environment claim requires more than isolated

episodes. *See Adusumilli v. Illinois Inst. of Tech.*, No. 97 C 8507, 1998 WL 601822, at *4 (N.D. Ill. Sept. 9, 1998).

Plaintiffs cite no legal authority that would support the idea that the Mesopotamia materials and the defiant slave question would meet the hostile environment standard. The materials did not condone slavery or depict slaves. The materials did not contain explicit racial slurs or racially charged images. To the contrary, the slide deck included a slide that honored Black leaders. And immediately after the slave question came to light, Patrick Marsh and school district administrators barred the use of the materials, acknowledged that they were hurtful, and apologized.

Plaintiffs rely on Levenberg's expert declarations, which the court will exclude. But his comments about the hostile environment claim further illustrate the conclusory nature of his opinions. According to Levenberg, Patrick Marsh, "students were harassed, intimidated, and bullied into assuming the role of 'Slave Master' and thus were consequently bullied into identifying as bully aggressors themselves." Dkt. 36-1, ¶ 17. But this claim utterly lacks factual grounding: there is no evidence that any students were actually harassed, intimidated, or bullied. And the assignment asks student to assume the role of judge, not slave master. Levenberg says that because the assignment came from school authority figures, it carried "great force and credibility" to students. *Id.* Levenberg did not interview students at Patrick Marsh about how they felt about the assignment or otherwise explain how the materials harassed and intimidated them. Without meaningful factual support or analyses, the expert declarations are merely Levenberg's *ipse dixit*, which the court will not consider. *See Wendler & Ezra, P.C. v. Am. Int'l Grp.*, Inc., 521 F.3d 790, 791 (7th Cir. 2008) ("We have said over and over that an expert's

*ipse dixit* is inadmissible. An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

Plaintiffs have not adduced evidence from which a reasonable jury could find a racially hostile learning environment. The court will grant summary judgment to defendants on the Title VI claims based on the Mesopotamia materials.

### b. Fourteenth Amendment claims

Plaintiffs also contend that the district violated Zavion's and George's rights under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. These claims fail for similar reasons that their Title VI claims failed.

For their Due Process claims, plaintiffs invoke the state-created danger doctrine, which applies when the state places a person in a dangerous situation and fails to protect the person from that danger. *Johnson v. Rimmer,* 936 F.3d 695, 706 (7th Cir. 2019) (citing *DeShaney v. Winnebago County Social Services Department*, 489 U.S. 189 (1989)). To hold the district liable for a Fourteenth Amendment violation under § 1983, plaintiffs must show that their rights were violated because of a widespread policy or custom. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978). So plaintiffs rest their state-created-danger claim on the district's failure to oversee teachers and instructional materials. Plaintiffs contend that this policy exposed Zavion and George to dangers posed by the assignment. Dkt. 39, at 28.

The facts of this case do not fit within the state-created danger doctrine, which generally involves individuals in danger of serious bodily harm. *See, e.g., DeShaney,* 489 U.S. at 189. It is reserved for only the most "egregious" government conduct. *D.S. v. E. Porter Cnty. Sch. Corp*., 799 F.3d 793, 799 (7th Cir. 2015). To prevail on a state-created danger claim, a plaintiff must show, among other things, that the defendant's conduct was so arbitrary and irrational that it

shocks the conscience. *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011). It does not shock the conscience that a school district would not monitor and oversee every single material that its teachers distribute. *See Webster v. New Lenox Sch. Dist. No. 122*, No. 88 C 2328, 1989 WL 58209, at *1 (N.D. Ill. May 30, 1989) (school districts enjoy wide latitude in the operation of schools and setting curriculums).

Plaintiffs again rely on Levenberg's opinion that the district failed to fulfill its responsibility of reviewing and monitoring modifications to the curriculum. Dkt. 36-1, ¶ 22. This statement, similar to many of the statements in Levenberg's declarations, is unsupported. Levenberg identifies no best practices or commonly adopted policies in education that conflict with the school district's practices.

Plaintiffs also bring class-of-one equal protection claims based on the Mesopotamia materials. Class-of-one claims are intended to forbid government actors from irrationally treating one person differently from other similarly situated persons. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 597 (2008). To prevail, a plaintiff must show that he was "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 685 (7th Cir. 2013).

Plaintiffs do not show how the district singled them out for treatment in any way. Zavion received the assignment along with all of the other students in his class. At the end of the day, all Patrick Marsh sixth graders were asked to join the Zoom meeting during which the school district apologized. And there is no evidence that the school district's response to the incident targeted Zavion or George. The assignment might have had a different effect on Zavion and George than it did on White students, but Zavion or George were not treated differently from their classmates.

18

The court will grant summary judgment to defendant on plaintiffs' Fourteenth Amendment claims.

### c. Establishment Clause claims

Plaintiffs contend that that the Mesopotamia materials violated the Establishment Clause. The Establishment Clause of the First Amendment says that Congress shall "make no law respecting an establishment of religion." The parties assume that standard in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) applies to Establishment Clause claims, but the continuing validity of the *Lemon* endorsement test is doubtful. *Kennedy v. Bremerton Sch. Dist.*, No. 21-418, 2022 WL 2295034, at *14 (U.S. June 27, 2022).

But even if *Lemon* applied, the court must determine first whether the challenged practice is religious in nature. *Fleischfresser,* 15 F.3d at 687; *Gonzales* 4 F.3d 1412, 1418 ("before we apply *Lemon*, we first must determine whether the challenged symbol is a religious one").

Plaintiffs' Establishment Clause claims fail, for the common-sense reason that teaching Hammurabi's Code was not religious education, it was a history lesson. The code is widely understood to be an ancient legal code, *see, e.g.,* Martha T. Roth, *Mesopotamian Legal Traditions and the Laws of Hammurabi*, 71 Chi.-Kent L. Rev. 13 (1995), and plaintiffs adduce no evidence to the contrary. Neither the school district nor the teachers who used the Mesopotamia materials promoted or endorsed Hammurabi's Code as a viable moral code or a religious way of life. No reasonable jury could accept plaintiff's contention that the district forced students to "engage in religion" by asking them to answer in the first person how they would punish a slave.

Plaintiffs again rely on Levenberg's opinion that "the Code of Hammurabi is theologically based." Dkt. 36-1, ¶ 18. But Levenberg is not a scholar of history or religion, and

19

he provides no basis for his conclusion. And his conclusion is irrelevant: even if all of Mesopotamian culture was theologically based, the teaching of that historical period would not constitute a governmental endorsement of Mesopotamian theology. Plaintiffs adduce Dazarrea and Priscilla statements that they interpreted the code to have religious undertones because, like religion, it offered principles to live by. But plaintiffs' subjective beliefs are not relevant to determining whether teaching about Hammurabi's Code amounts to governmental establishment or endorsement of religion.

Plaintiffs' theory that the teaching of Hammurabi's Code is an unconstitutional establishment of religion cannot be squared with *Lemon* or any other Establishment Clause standard. The court will grant summary judgment to defendants on this claim.

## B.  George's discrimination claims

Plaintiffs bring a second set of claims contending that the district mistreated George and allowed other students to bully him on the basis of race and his learning disability in violation of Title VI, the ADA, and Rehabilitation Act. The claims are premised on events that happened as early as 2014, when George was in kindergarten. Defendants do not raise statute of limitation issues so the court will not address the timeliness of the claims.

### 1.  Title VI claims

George brings a hostile educational environment claim under Title VI based on peer-to-peer bullying that he faced at schools in the district from kindergarten to seventh grade. As the court previously stated, to prevail on a peer-to-peer racial bullying claim, a plaintiff must show that: (1) the student participated in a federally funded program; (2) the alleged hostile environment was so severe, pervasive, and objectively offensive that it deprived the student of

20

access to educational benefits; and (3) the district had actual knowledge of and was deliberately indifferent toward the conduct in question. *N.K.*, 965 F. Supp. 2d at 1032.

The school district disputes George's showing only on the second element. But the school district does not contend that the harassment George suffered was not severe and pervasive. Rather, the school district contends that George cannot show that his harassment deprived him of access to educational benefits because he adduces no evidence that he suffered academically.

George's claim is foreclosed by *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003). In *Gabrielle M.*, a kindergartener brought hostile educational environment claims against her school district based on a classmate's sexual touching and harassment. *Id.* at 818–21. Plaintiff was diagnosed with acute stress disorder and separation anxiety, had bedwetting, insomnia, nightmares, and reduced appetite, received therapy, and requested a transfer to a different school because of her classmate's behavior. *Id.* at 822.

The court held that a plaintiff may only succeed on a Title XI claim if her harassment denied her equal access to education, meaning that it had a "concrete, negative effect" on her education. *Id.* at 823. Examples of what would qualify include dropping grades, becoming homebound or hospitalized because of the harassment, or serious physical violence. *Id.* The court concluded that although plaintiff "was diagnosed with psychological problems, the record shows that her grades remained steady and her absenteeism from school did not increase," so she had not been denied access to education. *Id.*; *see also Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010) (student-to-student sexual harassment did not deprive plaintiff of access to education when "her grades did not suffer, she was not extensively absent from school, she

graduated with a class rank of 27 out of over 500, and thereafter enrolled in college");
*Hendrichsen v. Ball State Univ.*, 107 F. App'x 680, 685 (7th Cir. 2004) (professor's obsessive behavior toward student, singling her out for attention, sending notes, flowers, stalking her, and lurking outside her apartment did not deprive student of access to education because she received an A in the class and her academic performance was unaffected).

George does not cite evidence of concrete, negative effects that denied his access to education under *Gabrielle M*. Between kindergarten and seventh grade, he missed only two days of school because of the bullying, which does not qualify as extensive or increased absenteeism. George missed no other classes, field trips, or extracurricular activities. And there is no evidence that his grades dropped, that he experienced serious physical violence, or that was homebound or hospitalized because of the harassment.

George stated in his declaration that he has concentration issues, severe anxiety and depression, and problems interacting with students and staff because of the harassment, and that these challenges interfere with his ability to learn. Dkt. 41, ¶ 10. But his declaration contradicts his deposition testimony. George testified in his deposition that he did not have issues concentrating or with classwork because of the teasing. Dkt. 24 (George Dep. 123:23−124:1). Plaintiffs do not explain the contradiction, so under the sham affidavit rule, the court will disregard George's statement that the racial harassment harmed his concentration. *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). Even if the court could consider the declaration statements, they are not detailed enough to determine how acutely these issues affected George's ability to learn.

George describes a disturbing history of racial harassment by some of his fellow students. The school district did not ignore George's struggles, but it did not effectively protect

him. Nevertheless, under the principles in *Gabrielle M.*, the court must grant summary judgment to defendants on the Title VI claim.

### 2.  ADA and Rehabilitation Act claims

Plaintiffs also bring, on George's behalf, claims under Title II of the ADA and § 504 of the Rehabilitation Act, codified at 42 U.S.C. § 12132 and 29 U.S.C. § 794 respectively. Both statutes prohibit discrimination against individuals with disabilities in the provision of public services. *Werth v. Bd. of Directors of Pub. Sch. of City of Milwaukee*, 472 F. Supp. 2d 1113, 1126 (E.D. Wis. 2007). Because the ADA and the Rehabilitation Act cover the same conduct, courts analyze claims under the ADA and Rehabilitation Act together. *Id.* George contends that the school district violated the ADA and Rehabilitation Act in two ways.

#### a.  Peer-to-peer disability harassment

George contends that the school district allowed his peers to harass him on the basis of his learning disability. A school district's inadequate response to student-on-student disability harassment may violate the ADA and Rehabilitation Act. *Id.* But to establish this type of claim, the plaintiff must show that the harassment was based on a disability. *Id.* at 1129. George contends that his peers' use of the n-word was aimed at his disability because the epithet connotes ignorance. He also says that one student who harassed him, Joey, saw George meet with a special education teacher and knew about his disability. But there is no disability animus inherent in the n-word. And just because Joey knew about George's learning disability does not mean that Joey bullied him on that ground. No reasonable jury could find, based on this evidence alone, that George was harassed because of his disability. The court will grant summary judgment to defendants on the claim based on disability harassment.

### b.  Isolation from the classroom

Plaintiffs contend that the district violated the ADA and the Rehabilitation Act by isolating George in a locked room on three occasions in first grade, which excluded him from classroom facilities. The district does not challenge the merits of this claim. It contends that plaintiffs failed to exhaust the available administrative remedies as required by the Individuals with Disabilities in Education Act (IDEA).

The IDEA ensures that students with disabilities receive special education services in schools. 20 U.S.C. § 1400 *et seq*. Section 1415(l) imposes an exhaustion requirement on claims brought under the IDEA, and on claims brought under similar statutes that seek relief that is also available under the IDEA, including the ADA and Rehabilitation Act. *Id.* Specifically, exhaustion is required when the crux of a plaintiff's complaint seeks redress for the denial of a "free appropriate public education," which is the IDEA's fundamental guarantee. *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154 (2017).

*Fry* provides an elaborate test guiding courts how to determine whether a complaint concerns the denial of a free and appropriate education. *Id*. at 755–57. And the school district dedicates several pages of argument to explaining why, under *Fry*, George's claim is fundamentally about the district's provision of a free and appropriate education and is subject to IDEA exhaustion. The district also cites *J.M. v. Francis Howell Sch. Dist.*, which states that when a student asserts that a school's decision to place him in isolation and physical restraints pursuant to an IEP plan denied him benefits of public education, IDEA exhaustion applies. 850 F.3d 944, 949 (8th Cir. 2017).

Plaintiffs did not respond to any of the district's exhaustion arguments in their response brief, so they have forfeited this claim. *See Nichols v. Mich. City Plant Planning Dep't.*, 755 F.3d

594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). The court will grant summary judgment to defendants on plaintiffs' claims under the ADA and Rehabilitation Act.

## C. Plaintiffs' state-law claims

Plaintiffs bring intentional infliction of emotional distress claims against the district under state law. The court would have supplemental jurisdiction over those claims under 28 U.S.C. §1367(a), which permits a federal district court to hear a state-law claim if it is related to a federal claim in the same action. Absent unusual circumstances, district courts will relinquish supplemental jurisdiction over state-law claims if all federal claims have been resolved before trial. *Coleman v. City of Peoria, Illinois,* 925 F.3d 336, 352 (7th Cir. 2019). Plaintiffs do not raise unusual circumstances or suggest any other basis for the court's jurisdiction over the state-law claims. The court will decline to exercise supplemental jurisdiction over plaintiffs' state-law claims and remand them to state court.


ORDER

IT IS ORDERED that:

1. Defendant's Sun Prairie Area School District's motion in limine, Dkt. 35, to exclude the opinions to Bruce I. Levenberg, is GRANTED.

2. Defendant's motion for summary judgment, Dkt. 27, is GRANTED.

3.  The court relinquishes supplemental jurisdiction over plaintiff's remaining state-law claims under 28 U.S.C. 1367 and remands them to state court.

4.  The clerk of court is directed to enter judgment and close the case.

Entered July 1, 2022.

<div style="margin-left:40%">

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

</div>